IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TACOSHIA VARNES,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:14-CV-03651-L** |
| | § | |
| **CAROLYN W. COLVIN**, Acting | § | |
| Commissioner of Social Security | § | |
| Administration, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Plaintiff's Opening Brief (Doc. 18), filed March 13, 2015; Defendant's

Brief (Doc. 19), filed April 13, 2015; and Plaintiff's Reply Brief (Doc. 22), filed May 25, 2015. The

court **vacates** the referral of this case to the magistrate judge, and, based on the relevant filings,

evidence, and applicable law, the court **affirms** the decision of the Carolyn W. Colvin, the Acting

Commissioner of the Social Security Administration ("Commissioner").

## I.   Factual and Procedural Background[1]

Tacoshia Deneen Varnes[2] ("Plaintiff") seeks judicial review of the Commissioner's final

decision denying her claims for disability insurance benefits under Titles II of the Social Security

Act.  On June 16, 2011, Plaintiff applied for disability and disability insurance benefits, alleging

disability beginning January 1, 2011.[3]  Her application was initially denied on November 16, 2011,

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  Plaintiff is also identified as Tacoshia Washington on some of her medical records. *See* R. at 436.

[3]  Plaintiff originally alleged an onset date of August 6, 2007, but amended her onset date at the hearing before the ALJ to January 1, 2011. R. at 69.

and again upon reconsideration on January 27, 2012. Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") and personally appeared and testified at a hearing on June 8, 2012. On April 23, 2013, the ALJ issued his decision finding Plaintiff not disabled. Plaintiff requested review of the adverse findings by the Appeals Council on June 24, 2013.  The Appeals Council denied her request for review on August 7, 2014, making the ALJ's decision the final decision of the Commissioner. Plaintiff timely appealed to this court pursuant to 42 U.S.C. § 405(g).

Plaintiff was born on ███████ 1975, and she was 37 years old at the time of the hearing before the ALJ.  She has not received a high school diploma or completed her GED.  She has past relevant work as a warehouse worker.[4]

On March 23, 2011, Vivian Ayozieuwa Okechukwu, M.D. and Reyna Avila, L.V.N., conducted a physical examination of Plaintiff at Parkland Health & Hospital System ("Parkland"). Plaintiff's past medical history identified a history of hypertension. Dr. Okechukwu noted that Plaintiff was oriented to person, place, and time, and that she appeared well-developed and well-nourished.  Plaintiff had tests performed on March 25, 2011, which identified that she was positive for Hepatitis B and anemia.

On March 27, 2011, at 8:07 p.m., Plaintiff was admitted to the emergency room at Parkland for abdominal pain and nausea.  "She [was] oriented to person, place, and time. . . . [and] [s]he appear[ed] well-developed and well-nourished, obese." R. at 386.  Plaintiff had a CT scan with contrast of her abdomen and pelvis.  She was discharged the following day at 2:19 a.m. with a prescription for Ciprofloxacin and Metronidazole.

---

[4]    The ALJ's decision only identifies Plaintiff's past relevant work as a warehouse worker (922.687-058, medium, SVP: 2) (R. at 40-42), but there was testimony at the hearing that she also had past relevant work as a home attendant (354.377-014, medium, SVP: 3) and security guard (372.667-034, light, SVP: 3). R. at 86.

**Memorandum Opinion and Order - Page 2**

On May 13, 2011, Plaintiff had a psychiatric diagnostic interview exam at Metrocare Services ("Metrocare"). She met with Kristen H. Grable, M.D., Metrocare's Medical Director. Dr. Grable noted that Plaintiff was "[s]elf-referred" and that she reported her chief complaint as feeling "[d]own and out." R. at 329. She also reported that her "Ex-[boyfriend] died [of] suicide a few [days] ago (funeral [pending])." *Id*. Plaintiff was not on psychiatric medication at the time of the diagnostic interview. She reported no suicide attempts or incidents of self-injury. Dr. Grable observed that Plaintiff was adequately groomed, cooperative, alert, and showed good impulse control but was also depressed and demonstrated signs of psychotic features and paranoid delusions. She appeared oriented to time, date, and place, and her thought process appeared goal directed. Dr. Grable started Plaintiff on Celexa, Trazadone, and Resperdol.

After meeting with Dr. Grable on May 13, 2011, Plaintiff also met with Terrence C. Stewart, B.S., a Qualified Mental Health Professional at Metrocare. Mr. Stewart noted that Plaintiff reported that she felt "overwhelmed" because of her lack of resources and her lack of work. R. at 332. She was directed to utilize a worksheet to help her notice stressors in her life and recognize the symptoms associated with them. Additionally Plaintiff was directed to "engage in adequate activities that [were] designed to eliminate stress . . . [such as] tak[ing] a walk, listen[ing] to music, [and] relax[ing]." *Id*.

On June 21, 2011, Plaintiff briefly met with Danielle J. Hooker, R.N., and Gary Watkins, N.P., at Metrocare. Plaintiff reported that she was "hearing voices hold a conversation" and reported a decrease in her appetite and "sleeping 3 hrs with meds." R. at 333-34. Nurse Hooker noted that Metrocare would continue to monitor effects of Plaintiff's medication.

**Memorandum Opinion and Order - Page 3**

On June 28, 2011, Plaintiff had a routine follow-up appointment with Daphne M. Daniels, A.P.N.   Nurse Daniels reported that Plaintiff appeared adequately groomed, cooperative, and showed appropriate psychomotor behavior; she continued to report psychosis and demonstrated a "dysphoric" mood.   R. at 336.   Plaintiff appeared fully oriented and reported to Nurse Daniels that she had experienced a 25% reduction in hallucinations and improved sleep, but had some mood swings. Nurse Daniels continued Plaintiff's medication but increased the dosage.

On July 28, 2011, Nurse Daniels saw Plaintiff again for a routine follow-up at Metrocare. She observed that Plaintiff was adequately groomed, cooperative, fully oriented, and that her psychomotor was appropriate.   Plaintiff reported that she was partially responsive to the medication and that her "mood [was] stable on [the medication]."   R. at 414-15.   Her medication was continued.

On September 26, 2011, Plaintiff had another routine follow-up at Metrocare with Nurse Daniels.   Nurse Daniels observed that Plaintiff was adequately groomed, cooperative, and showed appropriate psychomotor behavior.   Plaintiff was fully oriented, her mood was stable on her medication, and her auditory hallucinations continued to diminish.   Nurse Daniels continued Plaintiff's medication.

Plaintiff met with Lawrence Sloan, Ph.D., for a clinical interview with mental status examination for a disability evaluation on October 22, 2011.   Dr. Sloan observed that she arrived on time and was well dressed, groomed, calm, and cooperative.   R. at 353.   Dr. Sloan noted that "[Plaintiff] reported disability due to 'a lot of depression and a little psychosis going on.'"   *Id*.   "She stated she first sought care for her depressed mood in May, 2011, secondary to auditory and visual hallucinations and feelings of sadness. . . . [which] began three months prior, and did not relate onset to any precipitating events."   *Id*.   She reported to Dr. Sloan "that [her] hallucinations are less frequent

**Memorandum Opinion and Order - Page 4**

than prior to treatment, and feelings of sadness less intense." *Id.* She now experiences some days that include increased energy and motivation, and some days that include "mostly feeling sad, laying around, not doing anything." *Id.* Plaintiff reported to Dr. Sloan that she had a history of one suicide attempt, approximately four years prior, which was prompted by being "in a bad relationship." R. at 354. "She denied current or recent suicidal ideation," however. *Id.*

Plaintiff described her auditory hallucinations to Dr. Sloan as "voices" that included "whispering and sometimes like talking to me . . . call[ing] out my name." *Id.* Dr. Sloan noted that Plaintiff reported her visual hallucinations as "like a black thing flashing by." *Id.* Plaintiff estimated that she experienced an auditory hallucination several times per week, with her most recent episode occurring the day before her appointment with Dr. Sloan. *Id.* The episode consisted of "hear[ing] voices just whispering." *Id.* Dr. Sloan noted that Plaintiff presented with marginal judgment, intact insight, and marginal concentration. Dr. Sloan diagnosed Plaintiff with "Major Depressive Disorder, Single Episode, Severe with psychotic features (functional impairment due to depressed mood moderate; mild paranoid features)." R. at 356.

On November 8, 2011, Plaintiff went to Parkland with leg and back pain. She met with Dr. Okechukwu, who prescribed medication for her pain and ordered some tests. She was discharged and told to return in approximately four months or if symptoms worsen or fail to improve. On November 9, 2011, Plaintiff had an x-ray of her lumbar spine, AP and lateral. The x-ray revealed no abnormalities and mild osteoarthritis involving the facet joints of the last three lumbar segments with no subluxation.

On November 14, 2011, medical consultant Leela Reddy, M.D., assessed Plaintiff's mental residual functional capacity ("RFC"). Dr. Reddy rated Plaintiff's degree of limitation as mild for her

restrictions of activities of daily living and moderate for difficulties in maintaining social functions and maintaining concentration, persistence, or pace.  She noted that Plaintiff had no episodes of decompensation of extended duration.   Dr. Reddy concluded that Plaintiff's mental RFC was markedly limited only regarding her ability to understand and remember detailed instructions and to carry out detailed instructions.  In all other areas, Dr. Reddy concluded that Plaintiff was only moderately limited or not significantly limited.  She also concluded that Plaintiff "can understand, remember and carry out only simple instructions, make simple decisions, [attend] and [concentrate] for extended periods, interact [appropriately] with coworkers and respond [appropriately] to changes in routine work settings." R. at 376.

Plaintiff was admitted to Parkland emergency room on November 27, 2011.  She complained of numbness, headache, and back pain.  She was diagnosed with low back pain radiating to both legs and chronic back pain by Juan Marcos Rendon, M.D.  Dr. Rendon noted that "[Plaintiff] reports a dull and sharp pain for 'years', now worse over the past 4 months. Pain is sharp and dull, intermittent, worse with certain movements, relieved with rest and massage."  R. at 396-97. Plaintiff's past medical history at Parkland generally referenced depression and noted no psychiatric or behavior issues.  She was prescribed medication and discharged the same day.

On December 8, 2011, Plaintiff returned to Parkland with complaints of a reaction to her medication.  She reported numbness in her right arm and right leg that went away when she stopped taking some of her medication.   An x-ray of her cervical spine, AP and lateral, identified no abnormalities.

Plaintiff had a routine follow-up with Dr. Grable on December 27, 2011.   Dr. Grable observed that Plaintiff was alert, fully oriented, adequately groomed, cooperative, and showed no

signs of psychotic features. She continued Plaintiff on Celexa, Risperdal, and Benadryl, and added

Sertaline or Zoloft to Plaintiff's medications. Dr. Grable also completed a NorthSTAR Outpatient

Authorization Tools & Treatment Plan, which identified Plaintiff's diagnosis as a major depressive

disorder with psychotic features with a GAF rating of <=50. Dr. Grable also noted that Plaintiff's

"[c]urrent expression of suicidal/homicidal behavior does not represent significant change from

baseline (chronic history)" and that "[n]o employment is likely without support as indicated by 0

days of regular community employment in the past year."  R. at 494.

On December 29, 2011, Plaintiff returned to Parkland with a complaint of abdominal pain

and met with Melissa L. Jeter, M.A.  She was diagnosed with gastroesophageal reflux disease, and

medication was recommended.  Further testing was ordered, and  Plaintiff was instructed to avoid

certain foods.  She was dismissed later that day.

On January 17, 2012, Plaintiff had an examination of her spine at Parkland.  The results of

the examination were normal.  On January 19, 2012, Michael O'Callaghan, Ph.D., from the state

agency, reviewed Dr. Reddy's mental RFC assessment from November 14, 2011.  Dr. O'Callaghan

affirmed Dr. Reddy's assessment.   On January 24, 2012, Frederick Cremona, M.D. from the state

agency affirmed the assessment as written.  On February 21, 2013, Plaintiff met with Kevin R.

Johnson, P.A., at Metrocare.  Plaintiff did not have a scheduled appointment and was treated as a

walk-in.  Mr. Johnson observed that Plaintiff was adequately groomed, cooperative, and fully

oriented.  He reported that she was compliant with her medication but was experiencing "sad

moods," "crying spells," paranoia, and visual and auditory hallucinations.  R. at 492.  Mr. Johnson

increased Plaintiff's Resperdal dosage and discontinued her Celexa dosage.

On January 27, 2012, Plaintiff visited Parkland for further blood tests, which revealed an iron deficiency anemia.  On February 29, 2012, Plaintiff met with Elysia Moschos, M.D., at Parkland for a gynecological ultrasound.  Dr. Moschos reported no abnormalities.  On May 10, 2012, Plaintiff had blood tests at Parkland. On May 14, 2012, Plaintiff met with Gregory K. Graves, M.D., and Lindsey Chapman, M.D., at Metrocare for a routine follow-up.   Dr. Graves and Dr. Chapman noted Plaintiff's report that she had "been doing ok."  R. at 741.  She also reported crying spells several times a week, low energy, sleeping on average twelve hours a day, and auditory and visual hallucinations.  *Id.*  They observed that Plaintiff was adequately groomed, cooperative, and appeared fully oriented; she showed no psychotic features and her mood was "good."  *Id*.  Plaintiff's medication was adjusted.  Dr. Chapman prepared a treatment plan that noted Plaintiff had:

> [n]o functional impairment or minor functional impairment that does not disrupt [her] ability to interact with others, to maintain hygiene and functions of daily living, to fulfill role responsibilities, and to maintain activities, such as sleep, eating, and/or sexual interest, during the past 90 days.

R. at 744.  She also noted that Plaintiff had "[n]o need or desire to work."  *Id*.

On June 7, 2012, Dr. Grable completed a Medical Assessment of Ability to do Work-Related Activities (Mental) for Plaintiff.  Among other things, Dr. Grable listed Plaintiff's diagnosis as "Major Depressive Disorder, Recurrent, Severe With Psychotic Feature.  R. at 749.  She also concluded that in a number of areas Plaintiff had a substantial loss of ability to perform in a regular, competitive employment setting. On June 8, 2012, the ALJ conducted a hearing, at which Plaintiff and a vocational expert ("VE") testified.  Plaintiff was represented by counsel at the hearing.

In the ALJ proceeding, Plaintiff testified that she was 37 years old, 5 feet 5 inches tall, weighed 208 pounds, and lived with her husband and three of her children.  Plaintiff explained that she only continued her education to ninth grade.  Plaintiff testified that she had not graduated from

high school or earned a GED.  Plaintiff stated that she had not worked since 2010, but she previously worked as a warehouse helper for approximately two and a half years, a seasonal bell ringer[5] for one year, an unarmed security guard for approximately three years, and a housekeeper/home health care provider for approximately five months.  Plaintiff testified that she quit her most recent job as a housekeeper in July 2010, and she had not worked since then.[6]

Plaintiff testified that she was married, and her husband had been disabled since 2008. Plaintiff explained that she and her husband rented a home and resided with three of her children, aged four, three, and one.  Plaintiff stated that she had other adult children who did not reside with her.  Plaintiff testified that she did not do any household chores, including cooking, cleaning, or laundry, or take care of her minor children.  Plaintiff's testified that her adult children and husband's family took care of the chores and minor children.  When asked what she did all day, Plaintiff answered, "[n]othing."  R. at 76.  According to Plaintiff, she spent most of her day sitting in her room; she did not watch television, listen to the radio, use a computer, use a telephone, or even go outside anymore.  Plaintiff testified that she also did not regularly exercise or participate in activities with her minor children or family.

Plaintiff testified that she experienced auditory and visual hallucinations.  She stated, "[I] hear voices . . . I don't recognize. . . . [When I can understand them,] [t]hey say a lot of different things. . . . they just be like regular conversation, like name calling.  Sometimes I can hear, like babies crying."   R. at 80.  Her auditory hallucinations occurred five to six times a week.  *Id*. Plaintiff explained that she also experienced visual hallucinations that "look[ed] like shadows."  R.

---

[5]  This position was equated to "the Salvation Army thing on Christmas" at the hearing. R. at 70.

[6]  Plaintiff provided no detail regarding why she quit her most recent job; nor does she provide any detail regarding the termination or conclusion of her earlier employment.

at 81.  According to Plaintiff, the hallucinations "[s]ometimes they look[ed] like bugs . . . [or] people standing behind or something." *Id.*  Plaintiff testified that her hallucinations caused issues with her sleep, and she took medication for the hallucinations, which reduced the voices "somewhat," but not completely.  R. at 84.

Additionally, Plaintiff testified that she took medication for her high blood pressure, which caused headaches three to four times a week.  Plaintiff stated that she experienced neck and back pain, for which she took additional medication.  Plaintiff testified that her medications caused drowsiness during the day and at night when she took them.

The VE testified in the ALJ proceeding that Plaintiff had past relevant work as a home attendant (354.377-014, medium, SVP: 3), warehouse worker (922.687-058, medium, SVP: 2), and security guard (372.667-034, light, SVP: 3).  The VE further testified that there were no transferable skills involved in her past relevant work.  The ALJ asked the VE to consider a hypothetical person of the same age, education, and work history as Plaintiff.  The ALJ explained that the hypothetical person had no exertional, lifting, or carrying limitation; could sit, stand, or walk for six hours in an eight hour day; and had no push, pull, or any other kind of manipulative, postural environmental, visual, or communicative limitation. The ALJ asked the VE, from a mental standpoint, to consider that the hypothetical person was able to learn, understand, remember, and carry out simple tasks and instruction; could use judgment in making simple work related decision; could respond and relate appropriately to others, such as supervisors and coworkers; could maintain attention and concentration for at least two hour intervals; and could adapt to and deal with simple changes in work settings and environments.

The ALJ then asked the VE to opine, given the limitations and restrictions described, whether the hypothetical person could do any of claimant's past relevant work or other work that existed in significant numbers in the national economy.  The VE testified that the hypothetical person could work as a warehouse worker (922.687-058, medium, SVP: 2); a laundry worker I (361.684-014, medium, SVP: 2); hand packager (920.587-018, medium, SVP: 2); and linen room attendant (222.387-030, medium, SVP: 2).  The VE further testified that these positions have the following employment statistics: (1) laundry worker I: (national: 39,000; Texas: 3,000); (2) hand packager (national: 160,000; Texas: 9,000); and (3) linen room attendant (national: 80,000; Texas: 6,000).

In response to a question by Plaintiff's attorney, the VE opined that the hypothetical person would be unable to work as a laundry worker I, hand packager, linen room attendant, or warehouse worker if her psychosis and depression interfered with the ability to work fifteen percent of the time or more.  The VE further testified in response to a question by Plaintiff's attorney that a hypothetical person who took medication that caused her to fall asleep at unscheduled times, and was required to take unscheduled rest breaks beyond the normally allocated fifteen minutes permitted in the morning and afternoon and the hour for lunch, would be precluded from work as a laundry worker I, hand packager, linen room attendant, or warehouse worker.  The VE opined that these restrictions would preclude all competitive work at SVP: 2.

The ALJ issued his decision denying benefits on April 24, 2013.  At step one, he found that Plaintiff had not been engaged in substantial gainful activity since January 1, 2011, the alleged onset date.  At step two, he found that Plaintiff had two severe impairments: obesity and depression.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in the regulations.

Before proceeding to step four, the ALJ determined that Plaintiff had the following RFC: she could work at all exertional levels, and sit, stand, and/or walk for about six hours in an eight-hour workday. Additionally, ALJ determined that Plaintiff was not limited in pushing and/or pulling with her upper or lower extremities, and she had no postural, manipulative, visual, communicative, or environmental limitations. The ALJ determined that, from a mental state, Plaintiff was able to learn, understand, remember, and carry out simple tasks and instructions. According to the ALJ, in such a work setting and environment, Plaintiff could use judgment in making simple work related decisions; respond and relate appropriately to supervisors and coworkers; maintain attention and concentration for at least two-hour intervals; and adapt and deal with simple changes in work settings and environments. At step four, the ALJ determined that Plaintiff was able to perform her past relevant work as a warehouse worker because this work did not require the performance of work related activities precluded by her RFC. The ALJ concluded that Plaintiff was not disabled as the term is defined under the Social Security Act, before or after January 1, 2011, through the date of her decision

## II.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.* at 436 and n.1.

## III.   Analysis

The issue raised by Plaintiff is whether the ALJ applied the proper legal standard in rejecting the opinion of her treating physician Dr. Grable. Pl.'s Br. 1. Plaintiff contends that "the RFC was not supported by substantial evidence because the ALJ failed to recognize that Dr. Grable's opinion was entitled to 'special weight' even if not consistent with other evidence." *Id.* at 21.

### A.   Applicable Law

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has

expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f), currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he or she cannot perform the alternate work.  *Perez v. Barnhart*, 415

F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point

in the five-step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55,

58 (5th Cir. 1987).

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined

"medical assessment of an applicant's impairments with descriptions by physicians, the applicant,

or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378,

1386–87 (5th Cir. 1988) (per curiam).   The relevant policy interpretation regarding the RFC

determination states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ "is responsible for assessing the

medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*,

777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the

case record, including opinions submitted by treating physicians or other acceptable medical sources.

20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion is

evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions

from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or nonspecialist; and (6) any other factors that "tend to support or contradict the opinion."  *See id.* § 404.1527(c)(1)–(6).  The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries.  [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly."  *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  If the evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.   "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.   The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).   A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.   Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).   The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id*. (citations omitted)   Courts may not reweigh the evidence or substitute their judgment for that of the

Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *See Johnson*, 864 F.2d at 343 (citations omitted).

### B.  Discussion

Here, before proceeding to step four, the ALJ determined that Plaintiff had the following RFC: she could work at all exertional levels and sit, stand, and/or walk for about six hours in an eight-hour workday.  Additionally, she was not limited in pushing and/or pulling with her upper or lower extremities, and she had no postural, manipulative, visual, communicative, or environmental limitations. From a mental state, Plaintiff was able to learn, understand, remember, and carry out simple tasks and instructions, and in such a work setting and environment: she could use judgment in making simple work-related decisions, respond and relate appropriately to supervisors and co-workers, and maintain attention and concentration for at least two-hour intervals.  In reaching this determination, the ALJ considered the medical opinions of Dr. Grable and the state agency doctors and the medical records.

### 1.  Opinions of Treating Physician

The ALJ expressly considered the Medical Assessment of Ability to Do Work Related Activities (Mental) form, dated June 7, 2012, submitted by Dr. Grable.  On the form, Dr. Grable reflected that during her treatment Plaintiff exhibited signs of mental illness, including crying spells, anhedonia, appetite disturbance, sleep disturbance, paranoia, low energy, difficulty thinking/confusion, chronic depression, suicidal thoughts, and hallucinations/delusions. She opined that Plaintiff had some loss of ability to perform work but was "still capable of consistently performing" the following activities "independently, appropriately, and effectively":

1.   apply commonsense understanding to carry out simple one or two-step instructions;

2.   demonstrate reliability by maintaining regular attendance and being punctual within customary tolerances;

3.   maintain concentration for an extended period (i.e., two hours);

4.   act appropriately with the general public;

5.   ask simple questions or request assistance;

6.   maintain her personal appearance;

7.   behave in an emotionally stable manner;

8.   respond appropriately to changes in a routine work setting; and

9.   cope with normal work stress without exacerbating pathologically based symptoms.

R. at 748-49.

Dr. Grable also opined that Plaintiff had substantial loss of ability to perform the following activities in regular, competitive employment, that is, an eight-hour work day and could do them "only in a sheltered work setting where considerations and attention are provided":

1.   apply commonsense understanding to carry out detailed but uninvolved written or oral instructions;

2.   maintain attention/stay on task for an extended period of time (i.e., two hours);

3.   Perform at a consistent pace without an unreasonable number and length of rest periods/ breaks;

4.   accept instructions and respond appropriately to criticism from supervisors;

5.   get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and

6.   finish a normal work week without interruption from psychologically based symptoms.

**Memorandum Opinion and Order - Page 19**

*Id.* In Dr. Grable's opinion, Plaintiff would be absent from work only two days per month on average because of her impairment, symptoms, or treatment.

Although Dr. Grable was Plaintiff's treating physician, the ALJ concluded as follows:

(1)     [Dr. Grable's] opinions/conclusions do not meet *the consistency and well-supported requirements of SSR 96-2p.*, nor are they *consistent with the preponderance of the objective medical and other evidence of the record*;

(2)     as a treating doctor, neither [Dr. Grable], nor any other treating source, has placed or recommended hospitalization or placement in a shelter or highly supported living environment due to the severity of [Plaintiff's] impairments; nor has [Plaintiff] had to seek emergency treatment for such impairment;

(3)     [Dr. Grable's] opinion/conclusion are *inconsistent with her own findings or opinions in other parts of her report(s)*;

(4)     [Dr. Grable's] entries in her conlusory form do not state the objective or sufficiently explanatory bases or factors that support their opinion/conclusions, which failure detracts from the probative value to be given to the opinions/conclusions stated therein[;] *generally more weight is given to the opinion expressed by [a] claimant's treating sources*, since these sources are likely to be the medical professional most able to provide a detailed and longitudinal picture of  [her] medical impairments, and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone, or from reports of individual examinations or brief hospitalization (20 CFR 1527(d)(2), 416.927(d)(2), and Social Security Ruling 96-2p)[.] *[H]owever, when conlusory forms are submitted by treating sources without sufficient progress/treatment notes, or without citing appropriate diagnostic laboratory or objective evidence to provide such a longitudinal foundation upon which to objectively evaluate and analyze such opinions/conclusions, the basis for giving them controlling weight over other opinion evidence is no longer applicable*[;] and, [sic]

(5)     [Dr. Grable's] opinions/conclusions are on issues reserved to the Commissioner (e.g., RFC, PRW, application of the vocational factors, etc.) . . . a medical source statement may be based on the medical source's records and examination of the claimant, but does not reflect consideration of the other medical and non-medical evidence of record; thus, the medical source statement may provide an incomplete picture of claimant's abilities; moreover, the doctor is not a vocational expert; and, although a doctor may opine that a claimant is "disabled," it is not usually clear that the doctor is familiar with the definition of "disability" contained in the Social Security Act and regulations[.]

R. at 38-39 (emphasis added).   Because the ALJ found that the opinions were inconsistent with the objective medical evidence, he could reject them as not controlling without the need to perform a factor-by-factor analysis. *See Wilson v. Colvin*, No. 3:13-CV-1304-N, 2014 WL 1243684, at *8-9 (N.D. Tex. Mar. 26, 2014).   Since the ALJ could reject the treating physician's opinions as controlling under these facts, there was no legal error.

Plaintiff also argues that "[t]he ALJ's failure to explicitly acknowledge [that the treating physician's opinion is entitled to special deference] . . . strongly suggests that [s]he did not apply the proper legal standard in evaluating the treating source opinion here." Pl.'s Br. at 19. Plaintiff, therefore, asserts that the ALJ "incorrectly weighed the medical opinions of record as if they all begin on equal footing. The ALJ completely failed to recognize the deference to treating sources opinions required even if controlling weight is not accorded." *Id.*   Plaintiff contends that if the ALJ properly recognized this deference, "Dr. Grable's limitations would have been given greater weight." *Id*. at 25.   As discussed, however, the ALJ noted the deference normally accorded to treating physicians, considered Dr. Grable's opinions, and explained in detail why he did not give Dr. Grable's opinions controlling weight. Accordingly, the ALJ expressly acknowledged the special deference normally afforded to a treating physician and explained why it was not applicable to Dr. Grable's opinion.

### 2.   Opinions of State Agency Medical Consultants

State agency medical consultants ("SAMCs") are considered experts in Social Security disability determination and their opinions may be entitled to great weight if they are supported by the evidence. *Hardin v. Astrue*, No. 3:10-CV-1343-B BH, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011), *adopted by* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011).   Although the ALJ is solely responsible for assessing the claimant's RFC, in making this assessment, he must consider any

opinion by an SAMC regarding the claimant's RFC. SSR 96–6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996).  Specifically, "RFC assessments by [SAMCs] . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)" and "are to be evaluated considering all of the factors . . . for considering opinion evidence" outlined in 20 C.F.R. § 404.1527(c).  *Id*.  If the ALJ does not give controlling weight to a treating physician's opinion, as is the case here, he "must explain in [his] decision the weight given to the opinions of a [SAMC] . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining source." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003); *see also* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.").

In determining Plaintiff's RFC, the ALJ relied on and gave significant weight to the state agency opinions regarding Plaintiff's physical and mental impairments.  In this regard, the ALJ noted, "Their documents also establish that the *evidence of the [Plaintiff's] treating sources* [were] given its *due weight* when considered along with the evaluations of consultative physicians . . . before making their decisions, pursuant to the guidelines in Section 404.1527, 416.927 (SSR 96-2p)[.]" R. at 39 (emphasis added).  Moreover, in weighing the relevant evidence, he stated that the SAMC's "opinions are consistent with and supported by the preponderance of medical and other evidence in the record, especially evidence of medically acceptable clinical and laboratory diagnostic techniques." *Id*.  Accordingly, the ALJ properly considered the evidence of the SAMC in addition to that of Dr. Grable in making his disability determination.  As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and

the record as a whole.  The ALJ's narrative discussion shows he applied the correct legal standards and considered all of the relevant evidence.  Substantial evidence, therefore, supports the ALJ's RFC assessment and remand is not required.

Finally, Plaintiff argues that "[b]efore the ALJ can accept the limitations in SAMC Reddy's opinion and exclude all limitations in Dr. Grable's opinion, the ALJ had to apply the 404.1527(c) factors to determine the weight to assign Dr. Grable's opinion."  Pl.'s Reply 6.  In essence, Plaintiff argues that, even when rejected, a treating physician's opinions should be accorded special deference.  *Id*. at 2.

As noted above, the ALJ considered Dr. Grable's opinion as a treating physician and rejected the opinion.  The Fifth Circuit has repeatedly held that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Id.* at 455 (citation omitted).  After doing so, nothing more was required.  *See Newton*, 209 F.3d at 455-56; *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).  There was evidence here that supported a contrary conclusion to that offered by Dr. Grable.  The ALJ was thus free to reject Dr. Grable's opinion.

## III.    Conclusion

For the reasons stated, the court **affirms** the Commissioner's decision.

**It is so ordered** this 16th day of March, 2016.

Sam A. Lindsay
United States District Judge